IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

EASTERN DISTRICT—PHILADELPHIA, 1890.

## J. McDONALD v. ROCKHILL IRON & COAL CO.

APPEAL BY DEFENDANT FROM THE COURT OF COMMON PLEAS
OF HUNTINGDON COUNTY.

Argued April 21, 1890—Decided May 12, 1890.
[To be reported.]

1. It is the legal duty of a person about to step into the bottom of a shaft in a coal mine, in which, as he knows, heavy cages are constantly moving up and down with very great rapidity, to stop, look up the shaft and listen, for the purpose of ascertaining whether a cage is descending or about to descend therein.

(a) An employee in a mine, who was familiar with the workings of a shaft used for hoisting coal, stepped into the bottom of it, intending to cross the same on his way to his work, and was immediately struck and injured by a descending cage. The place was one of manifest and conspicuous danger.

(b) Before stepping into the shaft he looked up, from a position where the upward range of his vision was limited to ten feet, but did not do so at the instant of entering, when he would have had an unobstructed view; and he could have ascertained from men close by that the cage was about to descend, but made no inquiry:

2. In an action against the mine owner for such injury, when the facts above stated have been shown by the plaintiff's testimony and are undisputed, the necessary legal conclusion is that the plaintiff was guilty of contributory negligence, and the court should therefore direct a verdict for the defendant.

Statement of Facts.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WIL-
LIAMS, McCOLLUM and MITCHELL, JJ.

No. 12 January Term 1890, Sup. Ct.; court below, No. 37
December Term 1884, C. P.

On December 18, 1884, John McDonald brought case against
the Rockhill Iron & Coal Company, to recover damages for
personal injuries alleged to have been received by the plaintiff
in consequence of the defendant company's negligence. The
defendant pleaded not guilty.

At the trial, on February 14, 1889, the following facts were
shown:

On January 16, 1882, the plaintiff, who was then about fifty-
two years of age, was in the employ of the defendant company
as a miner of coal in its mine at Robertsdale, Huntingdon
county. On the morning of that day, about seven o'clock, he
entered the mine by what was known as No. 3 heading, to go
to his work. At a point in the mine, about a quarter of a mile
from the opening of No. 3 heading, was a perpendicular shaft,
extending from the floor of the main gangway to the surface of
the earth, a distance of from 70 to 80 feet. In this shaft were
two elevators or "cages," by means of which the loaded mine
cars were hoisted to the surface. The machinery was so ar-
ranged that while one of the cages was ascending the other
would be descending. When they were running, a man was
stationed at the top of the shaft to attend to removing the loaded
cars from the cages and to return them when emptied. The sig-
nals for hoisting the cages were given to the engineer, through
this man, by the drivers at the bottom of the shaft, who would
call up to him when their cars were placed in the cages. There
was no metal speaking-tube between the top and bottom of the
shaft. The cages were intended exclusively for hoisting coal,
and the miners were not allowed to ride in them, though they
sometimes did so. Except by descending the shaft in the cages,
the only way by which the miners could enter the mine was
through the opening to the surface, at the outer end of heading
No. 3.

The cages, when at the bottom, rested in excavations about
eighteen inches deep, made in the gangway, the purpose of
which was to bring the floors of the cages, when at rest, on

Statement of Facts.

a level with the floor of the gangway. These excavations were called "sumps." At the side of one of these sumps a passage, called a man-way, was cut out, around the shaft, sufficiently wide to enable a person to get through when carrying mining tools, by going sidewise. The plaintiff and other miners had to pass the shaft to get to their work, and the only way of doing so was by going through the narrow man-way, or else by crossing one of the sumps. The miners employed in the defendant's mines, including the plaintiff, were in the habit of passing over the floors of the cages when they would be resting in the sumps, and, at other times, of stepping into and passing through the sumps themselves. During the winter time the cages would be left at night suspended in the shaft, so as to avoid their freezing to the bottom of the sumps; and miners going to their work early in the morning would often cross the sumps while the cages were still in that position. The plaintiff was familiar with the shaft and its surroundings and the manner of operating it.

When the plaintiff, on the morning of his injury, reached a point about four or five yards from the shaft, he passed two drivers, engaged in conversation; one of them had sent up a loaded car, and the other had a car ready to send up and was waiting for the cage to come down. On reaching the shaft the plaintiff attempted to pass around it, but was deterred by reason of an accumulation of ice in the man-way, rendering it slippery. Standing in the man-way, he looked up the shaft as far as he could see from that position, which was to a height of about eight or ten feet. Neither cage was down at that time. He did not call up to the man at the top, to inquire whether the cages were running, nor make any inquiry of the drivers whom he had passed. Not seeing or hearing anything of them, and supposing that they were swung in the shaft, stationary, he stepped into the sump, with the intention of crossing it. While in the act of so doing, he did not look up; but just as he made a step to go through, after getting his whole body into the sump, being in a stooping position and looking down at the ground to see where he was stepping, he was struck by a descending cage and crushed to the earth underneath it. He testified that he had not time to look up from the sump before he was struck. Hearing him moan, one of the

drivers who was standing near, called up to the man at the top of the shaft to have the cage hoisted again, and this was done almost immediately.   The time usually occupied by the cages in descending the shaft was from thirteen to fifteen seconds, but on that morning they were running more slowly than usual.   One of the drivers testified that, although hard of hearing, he heard the cage descending before it struck the plaintiff. The plaintiff, however, testified that it made so little noise in running, that it was impossible to hear it.   On being asked, upon cross-examination, whether he took much time to examine either the man-way or the sump, the plaintiff replied: " A. I took time enough to go through; just as I got into the sump I was struck, I came there and I couldn't get through the man-way, and I wanted to get through as soon as I could to my work, and I had no time to take the time, as I thought it was all right."   A large part of the testimony describing the circumstances surrounding the accident, is quoted in the opinion of the Supreme Court, infra.

At the close of the testimony, the court, FURST, P. J., after reviewing the evidence, charged the jury in part as follows:

In 1877 [act of April 18, 1877, P. L. 56], the legislature passed an act providing the method for securing the health and safety of persons employed in the bituminous coal mines in Pennsylvania.   Several provisions of this act have been discussed in your hearing before the court.   It is only for the purpose of calling your attention to that portion of the act that we deem material, that we say that many of its provisions have no relation to the case that you are sworn to try. . . . .   There is, however, one provision in this act of assembly, to which I desire to call your attention, because it has a very important bearing upon the question of fact, which will be submitted to you.   It is the latter part of the sixth section, and it is in this language: " There shall be cut in the side of every hoisting shaft, at the bottom thereof, a traveling way, sufficiently high and wide to enable persons to pass the shaft in going from one side of the mine to the other, without passing over or under the cage or other hoisting apparatus.". . . . .

First, Did the defendant establish a passage way around the shaft, or did the defendant knowingly consent to and permit

Charge of Court below.

the miners to use a passage way through this pit? If you find that the defendant permitted a passage way through this pit to be used, then another very important question is to be determined by you before you can find a verdict against the defendant, and that is, did this plaintiff know of the dangerous condition of that passage way; or, by the use of ordinary care and diligence could he have known it at the time? If he did, or if he could have had such knowledge, and then entered into the pit, he cannot recover, because his injury would be the result of his own negligence; and wherever his negligence causes the injury, or participates in the injury, he cannot recover. If you find he had such knowledge, or ought to have had, under the circumstances of the case, or if you find also he did not use proper precaution, that he did not stop to look and listen, and then was injured, he could not recover.

But if you find that the defendant adopted this passage way through the pit, and if you find further from the evidence that the plaintiff used every precaution and care that he should have used under the circumstances, that is, before he entered the pit; that he looked to see whether the cages were in motion and that he listened to hear whether the cages were in motion, and that having no knowledge of the danger he passed into the pit; if you find that he was careful in all of these particulars, then a recovery may be had by the plaintiff; and we say to you further, that if the plaintiff knew that the cages were in motion and attempted to cross under, that of itself would be negligence on his part, because no man, who should enter under a descending weight of that kind, could expect not to be injured; it would be the ordinary result of going into a dangerous place under such circumstances.

If, upon a careful consideration of all the evidence, you find that the defendant was not negligent, your verdict must be for the defendant; or, if you find that although the defendant may have been negligent in some particulars with regard to these mines, and that the negligence of the defendant did not contribute to the injury of the plaintiff, then your verdict must be still for the defendant; if you further find that the plaintiff was negligent, even though the defendant was negligent, there can be no recovery. If, on the other hand, you find negligence on the part of the defendant and it resulted in the injury to the

Charge of Court below.

plaintiff, and you find that the plaintiff used due care and pre-caution and was not negligent, then it will be your duty to assess damages for the plaintiff for the injuries received on the 16th of January, 1882. . . . . .

The defendant has presented certain points in writing, and has requested the court to answer; it is our duty to read these points and our answers.

1. That the testimony of the plaintiff shows that he was guilty of such contributory negligence as to prevent a recovery.

Answer: This is a fact for the jury, and not for the court; we have instructed you fully in our general charge on that branch of the case.[1]

2. That the plaintiff, in his testimony, having admitted that " I did not look up when I got into the edge of the sump; just as I stepped down a foot or eighteen inches, the cage struck me; I did not stop to look when I stepped in, because I had not time; just as I stepped in I was struck; I was leaning for-ward looking down to the ground;" he is guilty of such con-tributory negligence as precludes a recovery.

Answer: We cannot affirm this point as a question of law under all the facts in the case. If the jury find that the plaintiff's own neglect contributed in any degree to his injury, he cannot recover. It is a question of fact for the jury.

3. If there was any negligence in the traveling way, pump, and pump timbers, under the fifth section of the act of 1877, it was the negligence of the mine boss, whose duty it was to keep a careful watch over the same; and, he being a fellow servant of the plaintiff, the defendant is not responsible for his neglect.

Answer: The point is not only refused under the eleventh section of the aforesaid act, but under the law generally; be-cause it is the duty of the employer to furnish his servant or employee with instruments and appliances that are reasonably safe for the purpose and use intended.[4]

5. That even if the defendant failed to adopt all the appli-ances provided for by the act of 1877, there is no evidence to show that the absence of any of them was the proximate cause of the injury, or contributed directly to the damage.

Answer: This is refused; the facts are for the jury.[3]

6. That the evidence fails to show that there was any wilful

failure on the part of the defendant to comply with the provisions of the act.

Answer: Our answer is, that it is immaterial; or, if material, it is for the jury and not for the court. The question here is, was the defendant guilty of any negligence which was the direct cause of the injury?

7. That a remedy and penalty having been provided for by the sixteenth section of the act, for the neglect of the duties imposed by the same, such neglect cannot be reviewed in this action.

Answer: This is not an action for a penalty under the sixteenth section of the act, but the plaintiff seeks to recover under the eleventh section for the direct damage sustained by him arising from the negligence of the defendant, and which negligence he claims was the direct cause of the injury.

8. That the plaintiff has shown no evidence of negligence on part of defendant or any of its employees contributing directly to the injury.

Answer: We refuse this point, because we submit the question of negligence of the defendant, as well as the question of contributory negligence on the part of the plaintiff, to the jury.[2]

The verdict of the jury was in favor of the plaintiff for $1,771. A rule for a new trial having been discharged, judgment was entered on the verdict, when the defendant took this appeal, assigning for error:

1–4. The answers to defendant's points.[1 to 4]

*Mr. W. Dorris* and *Mr. J. D. Dorris*, for the appellant:

1. All the facts affecting the question of contributory negligence were furnished by the plaintiff's testimony, and it was for the court to pass upon their legal effect: Delaware etc. R. Co. v. Cadow, 120 Pa. 572. The line of decisions laying down an invariable rule to govern the conduct of persons about to cross a railroad track, are applicable to the facts proved in this case. The plaintiff's conduct, while plausible enough at first blush, is seen, in the light of his own testimony, and in view of his surroundings at the time, to have been utterly reckless. He did not look, in the way the law requires. By simply in-

Arguments.

clining his head to one side he could have seen the exact position of the cage, and ascertained to a certainty whether it was in motion and in what direction. His looking from a point of view where his view was obstructed, was foolish negligence: Central R. Co. v. Feller, 84 Pa. 229. Nor could he have listened; for, as the testimony shows, he would have heard the cages, had he done so. The law requires listening, as well as looking: Penna. R. Co. v. Mooney, 126 Pa. 252.

2. He did not stop immediately before stepping into the pit; but, going on the assumption that the cages were swung in the shaft, he blindly rushed into danger, when a delay of a quarter of a minute would have removed all doubt and given him a safe and easy passage. He entered the sump stooping, with his eyes cast to the ground, although a glance upward at that moment would have saved him. Indeed, in view of the slow rate at which the cage was running that morning, it must have been in plain sight and easy reach when he stepped into the sump. It is vain for him to say that he looked and listened: Carroll v. Railroad Co., 12 W. N. 348; Marland v. Railroad Co., 123 Pa. 487. His failure to stop immediately before stepping into the sump was negligence per se: Penna. R. Co. v. Beale, 73 Pa. 509. The fact that he thought the cages were swung in the shaft does not excuse him. No one except a suicide would step into such a place of danger, without some such deceptive flash of thought. Had he paused to think, the presence of the drivers and mule, and the lateness of the hour, would have indicated that the cages were running or about to start.

3. The sole reason given by the plaintiff for not proceeding along the man-way, was that it was icy. Voluntarily leaving it on that account, he was injured by an entirely distinct cause, and the man-way was in no sense the direct cause of his injury: South Side Pass. Ry. Co. v. Trich, 117 Pa. 390; Lancaster v. Kissinger, 1 Penny. 257; Scranton City v. Hill, 102 Pa. 378. Negligence cannot be imputed to the company for failing to give notice of the starting of the cages in the morning: Lehigh etc. Coal Co. v. Hayes, 128 Pa. 294. The court should have withdrawn from the jury the mass of irrelevant testimony regarding the absence of the speaking tube and other appliances prescribed by the act of April 18, 1877, P. L. 57.

Arguments.

As § 2 of the act plainly indicates, these appliances are required only when carriages are used for lowering and hoisting persons, and it is admitted in this case that miners were forbidden to ride on the cages.  The defendant's third point, respecting responsibility for negligence of the mine boss, should have been affirmed: Redstone Coke Co. v. Roby, 115 Pa. 364.  In the case cited the alleged defect was in the ventilating apparatus, but the act of April 18, 1877, § 5, P. L. 57, makes no distinction between that and the traveling way.

*Mr. R. Bruce Petriken* (with him *Mr. M. M. McNeil*), for the appellee:

1. The defendant did not, as required by act of April 18, 1877, P. L. 57, have two openings to the mine, separated by natural strata of at least 150 feet in breadth; did not have a metal speaking tube from the top to the bottom of the shaft or any means of signaling; did not have a cage exclusively for persons descending and ascending; had no fence between the shaft and the man-way, and the latter was not such a traveling way as the law requires, if, indeed, it was one at all.  Having violated the provisions of the act, the defendant is liable under § 11, for the damages resulting from its failure of duty, and the rule to stop, look and listen has no application whatever, the statute being imperative that an action shall accrue to the injured party.

2. If, however, that rule has any application in this case, the plaintiff fulfilled his whole measure of duty in that respect. His testimony shows this, and shows that he took the way across the sump because he judged it the safest.  The presumption of law, moreover, is that he stopped to look and listen.  But whether he did so or not, it is the province of the jury to determine, as a question of fact: Penna. R. Co. v. Weber, 76 Pa. 170.  The court was bound to leave the case to the jury: Patterson v. Railroad Co., 76 Pa. 394; Rummell v. Dilworth, 111 Pa. 343; Penna. Coal Co. v. Nee, 12 Cent. R. 524; Oakland Ry. Co. v. Fielding, 48 Pa. 321; Kay v. Penna. R. Co., 65 Pa. 269.  It is only in exceptional cases that the court should determine negligence as matter of law: Phila. etc. Pass. Ry. Co. v. Hassard, 75 Pa. 376.  There was such disregard of duty in this case, that the court would have been justified in

Opinion of the Court.

declaring the defendant negligent, as matter of law: Penna. R. Co. v. Ogier, 35 Pa. 60 ; Pittsburgh etc. R. Co. v. McClurg, 56 Pa. 294; West Chester etc. R. Co. v. McElwee, 67 Pa. 311.

3. The negligence was not that of the mine boss. He had nothing to do with the construction of the shaft or man-way. He could not construct the stairs or fence off the man-way from the sump. His duty was simply to keep a careful watch and report. It was the duty of the defendant to furnish proper and safe appliances. The answer of the court refusing the defendant's fifth point and submitting the facts to the jury, was right: Oakland Ry. Co. v. Fielding, 48 Pa. 320. The general rule applicable to such cases is that " the injury must be the natural and probable consequence of the negligence ; such a consequence as under the surrounding circumstances of the case might and ought to have been seen by the wrongdoer as likely to flow from his act:" Lancaster v. Kissinger, 1 Penny. 257. The case was carefully tried and the defendant received at the hands of the court better treatment than it deserved.


OPINION, MR. JUSTICE GREEN :

The plaintiff was a miner of coal in the employ of the defendants, and was injured while at work for them in their mines. His injury was received while he was attempting to cross the bottom of a shaft through which the coal was taken from the mine to the surface. The shaft was about 80 feet in depth, and was provided with two cages, in one of which the coal was lifted up in cars, while at the same time, in the other, an empty car descended. The coal was brought to the foot of the shaft in cars by drivers, and placed on the cage. Notice to hoist was given by the driver to a person at the top, whose duty it was to start the machinery for hoisting, and thereupon the cage containing the car was elevated to the surface, and at the same time an empty car descended in the other cage. The movement of the cars in this way occupied a very brief space of time when they were running regularly; considerably less than a minute was all that was required for the up and down movement. The plaintiff was going to his work through the mine on the morning of the accident, and it was necessary for him to pass the shaft at the bottom to reach his destination. There was a man-way opened around it, through which the men passed, some-

times, but more frequently the habit of the most of them was to pass directly through the shaft, either under the cages if they were elevated, or over them if they were at the bottom. The plaintiff, alleging that the track of the man-way was obstructed with ice upon this occasion, attempted to cross the shaft underneath the cage, which was not at the bottom at the time. He stepped into the sump, which was a depression of the surface about a foot to eighteen inches deep, at the bottom of the shaft, and was struck at the instant he did so by a descending cage, and for the injury thus received this action was brought. The defendant, on the trial, asked for a binding instruction that the plaintiff, upon his own testimony, was guilty of contributory negligence, and therefore there could be no recovery. This instruction was refused, and the error assigned in this regard is the only one that will require our consideration.

The plaintiff had been working for the defendant for several years, and was perfectly well acquainted with the shaft and all its workings. He testified that he had passed through the shaft many times, and had also frequently ridden up and down on the cages. His own account of the accident was thus given:

" Q. State whether or not you started to cross the sump, and then what took place. A. When I went to cross the sump, the cage came down, and I could not hear it. Q. You attempted to cross when the cages came down? A. Yes, sir. Q. What took place then? A. The cage came down on me. Q. What then? A. I knowed nothing afterwards, till one of the drivers hollered up that there was a man killed under the cage, and he hollered up to the top to hoist; then I knowed or heard no more afterwards, till I was taken out." This was on his examination in chief. On cross-examination he testified: " Q. Where were you when you looked up? A. I was in this man-way, and I couldn't see them, nor couldn't hear them, [the cages,] I then looked up, and seen both of them was out of sight; then I took that was the shortest way to get through. Q. Then you came out of the man-way, and stepped down into the sump? A. I just stepped right off in the man-way. I went on the man-way, and right there I stepped off. I was just right to the end of it, and I couldn't get through there, and when I saw the cages were both out of sight I stepped right down into the sump. Q. Could you see up to

the end of the shaft? A. I could see only from the man-way up to the height of the timbers; that is all I could see up, and that is all I could see, even if I was out of the man-way. I couldn't see any further than the height of the timber. Q. How high would that be? A. I suppose that was eight or ten feet. Q. If you had looked up from the edge of the sump you could have seen up to the top of the shaft, could you not? A. I don't believe that I could, except when the cages would be up. I could see then. Q. You could see the cages if they were there; if you couldn't see daylight you would know the cages were there? A. Yes; I would know that the cages would be in the shaft if I couldn't see daylight. Q. If the cage was swung in the shaft, and you would look up the shaft, and wouldn't see daylight on that side, you would know that the cage was there, and that was what prevented you from seeing daylight from above, was it not? A. If the cage was up, I couldn't see daylight; I couldn't see any daylight at all. Q. You looked up, and you couldn't see any daylight? A. I couldn't see any daylight, and I couldn't see any cages. Q. Where did you stand when you looked up? A. in the man-way. Q. Did you look up when you stood under the cage? A. No, no; I had no time to look up, for as soon as I got off the man-way the cage struck me. Q. You stepped right from the man-way into the sump? A. Yes, sir; and as soon as I got there the cage struck me. Q. Then, as you stepped in the west edge of the sump, the cage struck you? A. Yes; the cage struck me just as I stepped down off the man-way. Q. You had to take a step down to get into the sump? A. Yes; just perhaps a foot or eighteen inches, perhaps. . . . . . Q. When you stepped from the man-way into the sump you did not stop to look? A. I hadn't time to stop to look when I was hit by the cage. Q. You did not look just as you stepped in? A. I looked up just before I stepped down into the sump. Q. But just as you stepped into the sump, or were in the act of stepping into it, you did not cast your eyes upward to see if the cage might not be coming? A. Just as I stepped into it I was struck. Q. While you were in the man-way did you not hear the cages running? A. No; if I could I would not have went in there, but I would have waited till they were down. Q. You say your hearing is

Opinion of the Court.

good?  A. My hearing is good.  Q. So, if those cages had been running, you would have heard them?  A. No man can hardly hear them, for they make no noise of any kind, and no man can hear them.  Q. You have been around that shaft quite a while since those cages were running?  A. Yes, sir; I have been around a good bit, and I have seen them going up and down many a time, and I never could hear them until they would come into sight. . . . . .  Q. Do you know how long it takes a cage to come down?  A. I couldn't tell you. Q. You don't know how long it takes a cage to come down? A. I don't know; I never timed it; maybe a minute, or it don't take that long. . . . . .  Q. Did you look to see if there was any cage down?  A. I looked, and there were no cages down at all.  Q. Did you look?  A. Of course I looked; I looked up.  Q. Where were you when you looked to see? A. Didn't I tell you when I looked I was in the man-way, and when I looked both cages were up; there was no cage down at all when I looked.  Q. If the north cage was down, you would know the other was up, wouldn't you?  A. I would know if one was down the other was up.  Q. Then if you didn't see either of them down you knew that the south cage was either going up or coming down?  A. I know nothing about that at all, whether they were working up or down; I didn't know anything about that at all.  Q. When you stepped into the sump you didn't know whether the cages were swung or whether they were going up or down?  A. If they weren't swung, of course they must have been going.  Q. If you had looked up just as you stepped into the sump, you could have seen the cage, could you not?  A. Didn't I look up, and couldn't see them?  How often are you going to ask me that question?  Q. You looked up from the man-way, you say? A. Yes, sir.  Q. But if you had looked up just as you stepped into the sump you could have seen the cage?  A. I told you I had no time to look up from the sump.  I was struck with the cage the minute I set my foot in the sump.  Q. Supposing you had time to look up, and you could have seen it?  A. I couldn't see it till it came into sight, and I couldn't hear it until it came into sight.  Q. It must have been very close to you if it struck you just as you stepped into the sump; it must have been almost in sight?  A. I couldn't tell you whether it was

or not.   Q. If it struck you that instant that you stepped into the sump, it must have been very close to you?   A. It may be, for all I know; it may have been 10 or 15 feet high, and they may come down very quick. . . . . .   Q. You didn't take much time to examine either the man-way or the sump, did you?   A. I took time enough to go through.   Just as I got into the sump, I was struck.   I came there, and I couldn't get through the man-way, and I wanted to get through as soon as I could to my work, and I had no time to take the time, as I thought it was all right.   Q. You did not call up to the man at the top of the shaft, and ask if the cage was running?   A. That was not my business at all. . . . . .   Q. Had you both feet in the sump when you were struck?   A. Yes, sir; my whole body was in it.   Just when I made a step to go through I was struck.   Q. How were you knocked?   A. I couldn't exactly tell you, but it seems to me when it struck me on the head it just put me down that way; pushed my head right down between my feet.   If I had been standing up straight, it would just come down fair on my head, and crushed me down and killed me at once.   Q. You were in a kind of stooping position, then, when it struck you?   A. I was just in that position,—in a stooping position, of course.   You would have to look down to see where you would step to, to walk to, and as a matter of course you were leaning forward a little, and you can't walk under-ground, when it is dark, as you can on top of the earth, where it is light.   Q. Why didn't that cage crush you down to the bottom?   A. The reason is, I guess, because I was leaning too much forward at the time it struck me, I guess, and it kind of doubled me up, with my head between my feet, or I would have been knocked lifeless.   Q. Why, wouldn't it have killed you, anyway, if the engineer hadn't been very careful in letting down the cages?   A. The engineer that was there was very careful in letting them down in the morning, and that was the only thing that saved me; for if they had let them down as they run them during the day, I would have been gone.   Q. It was because the cage ran slowly; that is the reason you were not killed, is it not?   A. Yes, sir; from anything that I can tell, except the will of God. . . . . .   Q. You were familiar with the running of the cages, weren't you?   A. I knowed how they went, and how

they worked. Q. You knew that if one cage was down the other was up? A. Yes, sir. Q. And you knew that when the south cage was down that it would not be hoisted until the man at the top would get the signal from one of the drivers to hoist it? A. No; I knew that it wouldn't be hoisted until they gave the signal to hoist it. Q. So, if you had waited but a minute or a quarter of a minute, you would have seen that the cages were running? A. Yes, sir; except sometimes they were working them cages when there are no cars at all there, they are working them up and down to see that they are all right." On re-direct examination he testified: " Q. You said you looked up from the man-way? A. Yes, sir. Q. If the cars were swinging, could you see them? A. Of course I couldn't. Q. How far could you see if there was no cage in the shaft? A. Just the height of the timbers. Q. How high is that? A. I suppose about 9 or 10 feet."

The foregoing quotations are the entire substance of the plaintiff's personal testimony. No other witness but himself testified to the very facts of the accident. Other witnesses for the plaintiff testified to other facts occurring immediately before and just after the accident, but, as to the exact circumstances of the accident itself, the plaintiff was the only witness.

That the place into which the plaintiff stepped was a dangerous place was not only intrinsically and necessarily true, but that fact was also affirmatively proved by the plaintiff by the testimony of another witness, Thomas Heath. He said: " Q. You never crossed under the cages while they were running? A. Oh, yes; very often, I have. Q. Did you ever do it without looking up to see where they were? A. Yes; I have done it. Of course, it was very negligent in me. I have been there in a hurry, attending to my work, when I have run across frequently. Q. You risked your life when you did it, did you not? A. Yes, sir; I did. Of course, I knew better than to do it. Sometimes I would forget. Q. There was nothing to prevent you from seeing the cages, if you would look up? A. Not if I would look up." Another witness for the plaintiff, Hugh McIntyre, testified: " Q. When you would go under the cages through the sump you would always take care to see if one of the cages was down, would you not? A. I generally would look where I was going to when I go into dan-

ger.  Q. It would be dangerous for you to have crossed in there, that cage, without looking up to see where the cages were, would it not?  A. Yes, sir."

Two of the plaintiff's witnesses, William Trout and Hugh McIntyre, testified that they were mule drivers, and were engaged that morning at their work, when the accident happened. They were very near the foot of the shaft,—only three or four yards from the bottom; and almost immediately after the plaintiff passed, they heard him moan, and went to his relief, finding him under the cage.  They both said the cages were running.  Trout testified: "Q. Did you see on the morning that this injury occurred Mr. McDonald come into the shaft? A. I passed him coming in that morning.  How far were you from the bottom of the shaft?  A. Some 3 or 4 yards from the bottom.  Q. He passed you, and went on toward the shaft, did he?  A. Yes, sir.  Q. When did you see or hear Mr. McDonald after he passed you?  A. Just shortly after he passed me I heard him moan.  Q. Did you proceed to where you heard him moan?  A. I went there, and found the old man under the cage.  I called to the top of the shaft for to hoist. Q. Where did you find him lying when you went there? A. He was lying right in under the cage."  He further said: " I was waiting on the cage to be lowered down, so as I could get a load in."  On cross-examination he testified: "Q. You heard the cage coming down that struck him?  A. I heard the cage coming, and heard him moaning then.  Q. Are you quite hard of hearing?  A. Yes, sir.  Q. The cages had been running before McDonald got there that morning, had they not?  A. They were running when he came there. . . . . Q. You had a car loaded ready to send up, and were waiting for a cage to come down?  A. Yes, sir. . . . .  Q. When you hallooed to hoist the cage, after you heard Mr. McDonald under the cage, they hoisted immediately, did they?  A. Yes; they hoisted right up; there was no time until it was right off him."  McIntyre said he was a driver, and was present near the shaft, and saw the plaintiff coming down the heading; and the next he saw him was under the cage, and he went to him, and called to the man at the top to hoist.  He further testified: " Q. What had you done at the bottom of the cage that morning before McDonald passed you.  A. I had hitched my mule

Opinion of the Court.

up, and loaded a car up on the cage, and hoisted it up, or told them to hoist it up. . . . . Q. How far were you and Trout standing from the bottom of the shaft? A. About 4 or 5 yards, I should judge it to be. Q. How long had you been talking to Trout before McDonald came in there, before he passed you? A. I noticed him coming about 50 yards from me, when I crossed over and turned my back to talk to Trout, and I was talking while he was passing. Q. The empty cage that came down while your loaded cage went up, is the one that struck Mr. McDonald? A. Yes, sir. Q. This cage must have been coming very slowly, if from the time you started it up until the descending cage struck Mr. McDonald you were able to walk over 10 yards and converse with Trout? A. Yes, sir. Q. How did the cages generally run, as regarding speed? A. They generally run very fast. . . . . Q. At the bottom of the sump you could look up and see the cages running in the shaft, could you not? A. If you would go close enough, you could look up, and see the boiler at the top of the shaft." George Figard said that he was the man at the top of the shaft who hoisted the cages; that the work commenced at seven o'clock that morning; that he had hoisted one car of coal; and then was asked: " Q. What was the first you knew of the man being hurt at the bottom of the shaft? A. About the time we got the load, or it wasn't hardly up, we received another hoist; that is, a man under the cage. Q. What did you do? A. Hallooed to the engineer to hoist, there was a man under the cage." The plaintiff's witness Thomas Heath testified: " Q. Standing at the bottom of that shaft, and if the cages were out of sight, was there any daylight from the top of the shaft? A. If one cage was up, I could see the shadow of daylight; if it was down, I could see daylight pretty well. I mean by that if the cages were pretty far up I could see the shadow of daylight. Q. What was there to prevent you from seeing the cages if they were up? A. If the cages were up, I couldn't see daylight, and they would prevent me. Q. But what was there to keep you from seeing the cages? A. I don't know that there was anything to keep me from seeing the cages if I was in the sump. If I was back, I could see a piece up. I couldn't see very far up."

The foregoing testimony was all delivered by the plaintiff

and his witnesses. It constitutes the basis upon which a recovery is sought. When considered in detail, it proves conclusively that when the plaintiff arrived at the foot of the shaft the work of the day had commenced, and the cages were running in their accustomed manner, up and down the shaft. The plaintiff knew well what that manner was. He knew that they moved rapidly up and down. If he had been in doubt as to their being in operation, he could have ascertained the fact in an instant, by simply inquiring of either of the drivers, who stood close by, or by calling up the shaft to the man at the top. He did neither. He could easily have seen up the shaft, and discovered the situation of the cages, if he had chosen to do so, but he did not. He looked up as far as the top of the man-way, but that was only nine or ten feet, and at the time he looked he was in the man-way, and, of course, could only see within its limits. But the man-way was outside the shaft, and he could see no part of the interior of the shaft, except the portion of its base which was beside the man-way. He knew the cages were not at the bottom, and therefore that they were up in the shaft. But he testifies himself, and it is the only testimony in the case on that subject, that he did not look up the shaft. The only reason he gives for not doing so is that he had not time, and that is no reason at all. A few seconds would have been sufficient for the purpose; but, whether it took seconds or minutes, it was his plain legal duty to take the time and look up the shaft, before stepping into the sump.

That place was one of manifest, conspicuous danger. It had that character as a necessary consequence from the use of the shaft and the cages, which was perfectly well known to the plaintiff. But, in addition to that, one of his witnesses testified positively, directly, and affirmatively to the fact of the danger. Notwithstanding all this the plaintiff stepped directly into this place, knowing that the cages were above him, without taking the slightest precaution for his safety. He made no inquiry of the drivers. He did not look up the shaft. He knew it was the time of day for the cages to be in motion, and in point of fact they were in motion, and he knew that he was in danger of death if he was struck, yet he walked deliberately into this death-trap with his eyes open, and in

the full possession of his faculties. The question of his culpable and contributory negligence was not an open one. It was a necessary legal conclusion, from his own acts and omissions, proved by himself and his witnesses, not in the least controverted by any one. The very instant he stepped into the sump the consequences of his negligence were brought home to him; he was struck by a descending cage, and severely injured. We say of one who is about to cross a railroad track that it is his legal duty to stop, before he reaches the track, and look both ways, and listen, before stepping on the track, and that if he fails to do all of this he is guilty of contributive negligence by conclusion of law. With much greater force is the reason of that rule applicable to the undisputed facts of this case. The plaintiff was down in a coal mine. He was at the foot of a shaft in which rapidly moving, heavy cages were constantly running during working hours; the light was necessarily dim; the danger was certain and manifest, unless precautions were used; there was nothing to invite carelessness, everything to suggest care; the duty of care was even greater than in the case of crossing a railroad track, for there everything can be easily seen, whereas, here the looking must be more intent, more patient, more cautious, in order to insure safety. The danger is greater because it is in a comparative degree concealed, and should be searched for, while it is just as swift and as sure as in case of a locomotive. But there were other precautions which might easily have been taken, but were not. A simple inquiry from men close by would have revealed the danger, but it was not made. In short, in every aspect of the case, the plaintiff's negligence is conspicuous, leaving out of consideration the use of the man-way, which was possible, and would have prevented the injury. Further discussion is unnecessary. We think the defendant's first point should have been affirmed, and the jury directed to find a verdict for the defendant.

Judgment reversed.