STEVE DENNIS, Appellant, v. WILLIAM GIBSON, Appellee.

**NEGLIGENCE:** Custom Inducing Violation of Statute. Reliance on a custom will not justify the clear violation of a mandatory statute. So held with reference to the statutory prohibition against miners' passing *"across the shaft bottom."*

PRINCIPLE APPLIED: A mine shaft housed two cages, which were so constructed that, when one cage ascended to the tipple, the other cage descended to the bottom of the shaft. A custom grew up, however, to the effect that, when a cage did not go to the tipple, but only went to the surface for supplies, said particular cage would be returned to the bottom of the shaft before the companion cage was so returned. The statute positively forbade anyone from passing "across the shaft bottom," except employees working *"at"* the bottom of the shaft." (Sec. 2486-j, Code Supp., 1913.)

On one occasion, when the north cage was at the tipple, the south cage ascended to the surface for supplies. Had the custom been followed, the south cage would have gone to the surface and stopped (thereby leaving the north cage suspended somewhere in the shaft), and would then have taken on supplies, and at once descended to the bottom of the shaft, thereby again raising the north cage to the tipple. *But the custom was not followed.* When the south cage started to ascend, and the north cage reached the surface of the ground, in its automatic descent, the defendant, superintendent of the mine, caused said north cage to stop, and he stepped thereon, and directed the engineer to take him to the bottom. The cager at the bottom of the shaft, supposing the custom would be observed, passed *across the north shaft bottom*, and was hit and injured by the descending north cage.

*Held*, the cager had no right to rely on said custom and thereby violate the statute,—that he was guilty of negligence *per se*.

**MASTER AND SERVANT:** Contributory Negligence—Passing Along Known Dangerous Way. A servant who, in the ordinary discharge of his duties, rejects a concededly safe way of travel for one attended at all times by grave and impending dan-

ger, is guilty of contributory negligence. So held where a miner attempted to pass across the bottom of a shaft, and was hit by a descending cage.

**MINES AND MINERALS:** Negligence in Passing Over Shaft Bottom. The statutory declaration that the shaft bottom of a mine may be crossed only by employees who are necessarily working "*at* the bottom of the shaft," applies solely to those who are working *in* the sump—that part of the shaft which is below the cage when it comes to rest. (Sec. 2486-j, Code Supp., 1913.)

PRINCIPLE APPLIED: See No. 1.

**STATUTES:** Construction—Exceptions to Prohibitions. When a statute sweepingly prohibits the doing of a dangerous thing in a certain place of work, and then *excepts* certain persons from such prohibition, the grave and ever-impending danger of doing said act under any circumstances may furnish strong justification for a very strict and literal interpretation of said exception.

PRINCIPLE APPLIED: See No. 1.

*Appeal from Polk District Court.*—LAWRENCE DEGRAFF, Judge.

JANUARY 12, 1918.

REHEARING DENIED MAY 10, 1918.

ACTION for damages resulted in a directed verdict and judgment for the defendant. The plaintiff appeals.—*Affirmed.*

*S. B. Allen,* for appellant.

*Stipp, Perry, Bannister & Starzinger,* for appellee.

LADD, J.—The plaintiff, who had been employed by the Gibson Coal Mining Company about 6 years, and, after February, 1915, as a cager at the bottom of the shaft, was injured on September 21st of that year. He brings this action, not against his employer, but against the superintendent of the mine, and bases his action on the claim that defendant was negligent in that, without warning, he

violated the customs and rules of the mine, in coming down in the wrong cage, at a time when he should have known that plaintiff might be beneath it. It appears that the company had a double shaft, extending from the surface up to the tipple where the coal was dumped, and into the earth about 185 feet. Each shaft was 4½ feet wide and about 6 feet long, the one immediately north of the other. There was a cage in each shaft, operated by an engine, and so adjusted that, when one was being raised, the other was lowered. The excavation for the shaft extended about 6 feet below the floor of the mine, and this was called the sump. Usually, water settles there, and is pumped out. Cars loaded with coal from the entries were run on the cage at the bottom and raised to the tipple, where they were dumped, and the empty cars were taken down and returned through the entries to the miners. Supplies were taken down from the surface, and men were taken from there and returned. The main entries extended east and west from the shaft, and were laid with double tracks. The duties of plaintiff were to remove empty cars and those loaded with supplies from the cages at the bottom of the shaft, and to put cars loaded with coal on the cages to be carried to the tipple, and also to oversee loading and unloading the miners as they came from and returned to the surface. The cars were taken to and from the shaft in the main east entry by cable, operated by the engine. From 8 to 12 cars, called a trip, were brought at a time, and one of plaintiff's duties was to jerk a rope, and in that way disconnect the cars from the cable; and, when the cars were about 25 feet from the cage, to kick a latch, thereby switching the cars towards the cage on which to be loaded. The tracks in the entry gradually ascend to that point and descend towards the shaft. The rope must be jerked promptly, else the cars pile up. The trip rider, when the rope is jerked, throws sprags in the wheels to stop the cars until needed. The

empty cars are coupled together, the rope attached, and then they are drawn back by the cable to the places where required. In the west entry, the cars are hauled by mules, and it was a part of the plaintiff's duty to put the loaded cars from that entry also on the cage, and to remove the empties therefrom. A pump, at the bottom of the shaft and at the south side of the shaft and somewhat back therefrom, was operated by steam from the engine. Between the pump and the main shaft was what is known as a quarter shaft. At its narrowest place between the pump and main shaft, the space was less than a foot wide, and only this width for 18 inches, but the quarter shaft was about 6 feet long. This was the only passageway from one side of the shafts to the other, except a way around the cages in the opposite direction, estimated by plaintiff to be a distance of 150 or 200 feet. The latter was for the use of miners and mules, and was unobstructed.

The plaintiff testified that, at about 2:30 o'clock in the afternoon of September 21, 1915, plaintiff sent a car loaded with coal up on the north cage. Habelitz called from the ground landing and told him to clear the bottom of the south shaft, as he wished to send down a carload of ties. Clearing the bottom meant to take an empty car therefrom and ring the bell twice, thereby signaling that everything was ready for the cage to rise. Plaintiff then went to work at the pump, and, after being at that a while, noticed that the trip (train of cars) was coming in on the cable, and immediately climbed across the north shaft; and, as he did so, the cage came on him from above, injuring one arm severely, and pressing him part way in the water of the sump. This cage was descending from the tipple; and, as it reached the surface, defendant, wishing to go into the mine, entered the cage with the empty car, and directed Habelitz to let him down; and this was what was being done when the collision occurred.

Three questions · are presented: (1) Was defendant negligent, and if' so, did his negligence contribute to the injury? (2) Was plaintiff at' fault in undertaking to cross the shaft? (3) Is defendant chargeable for dam-ages due to the injury of a fellow servant, consequent on defendant's negligence; and if so, is he relieved by the Employers' Liability and Workmen's Compensation . Act? For the purposes of the case, it may be conceded, without deciding, that the action may be maintained, owing to Sec-tion 2489-1a, Code Supplement, 1913; and evidence that de-fendant ignored a custom of the mine was for the jury, on the issue as to defendant's negligence. Was plaintiff at fault in what he did? To determine this, some additional evidence should be recited.

A person could pass from one side of the shaft to the other when the pump was not running; but when pump-ing, a stream of hot water fell from the exhaust pipe, and hot steam escaped, so that plaintiff could not pass through when the pump was being operated. The defendant knew this, and had promised repair; but none had been made, though a mechanic had been working at the pump, and on the day in question had directed plaintiff to start it and see if it would work. He could have stopped it and gone that way, but would have had to wait for the hot water to cease dropping, and the hot steam to dissipate. He could have gone by the other passageway. His excuse for doing neither was that, after hearing or seeing the approach of the trip (train of cars), prompt action was necessary in order to jerk the rope and kick the latch, and thereby prevent the cars from piling up, and he was compelled to cross the shaft to reach the east side in time to perform this duty, and had been so doing since February preceding.

Several witnesses testified that it was the custom of the mine that, when the bottom of one shaft had been cleared, and the cage taken to the *surface* for supplies or

**1. NEGLIGENCE: custom inducing violation of statute.**

other purpose, it was returned to the bottom before the other cage was let down. But neither this custom nor the emergency of jerking the rope would excuse defendant for violating the statute prohibiting him from crossing the bottom. The place was one of manifest danger, and so described by plaintiff:

"When I was injured, I did not look upwards at any time to see if the cage was coming down, *because, if I had looked up there, there would be more danger than the way I was—more danger than climbing across the*

**2. MASTER AND SERVANT: contributory negligence: passing along known dangerous way.**

*opening, because I would be liable to be cut in two in looking up the shaft.* I didn't look up. When I went to get across, I just started across. There was no way I could see the cage coming down until it got down. There was no way to tell when the cage was coming down until it comes down so low you can see it. Small chunks of coal or dirt fall off the cage only when the car is dumping, then lots of times it comes back. This is when it is on the top of the tipple. In the act of dumping, particles of coal will fall off and fall down."

Notwithstanding such situation, he had been crossing this bottom since February, and probably so did at this time, rather than in reliance on the custom. If so, he was negligent therein, as has been declared in numerous decisions. *McDonald v. Rockhill Iron & Coal Co.*, 135 Pa. 1 (19 Atl. 797); *Rush v. Coal Bluff Min. Co.*, 131 Ind. 135 (30 N. E. 904). See *Smith v. Kestner & Hecht Co.*, 157 Ky. 282 (162 S. W. 1133); *Powell v. Ashland Iron & Steel Co.*, 98 Wis. 35 (73 N. W. 573).

In *Contri v. Hollingsworth Coal Co.*, 143 Iowa 115, a miner was held to have been negligent in passing over the cage. The fact that what plaintiff did was in direct violation of an express prohibition of the statute, however, puts

the matter beyond debate. Section 2486-j of the Code Supplement, 1913, provides that:

"At the bottom of each hoisting shaft there shall be constructed a safe and convenient traveling way around the shaft for employes and animals, and it shall be unlawful for any person to pass across the shaft bottom in any other manner than by the traveling way herein contemplated; except such employes as may be necessary to perform the work at the bottom of the shaft or those engaged in making repairs."

3. MINES AND MINERALS: negligence in passing over shaft bottom.

The evident design of the lawmakers was to guard against injuries from the operation of the cages in the shaft. This is sought to be accomplished by providing a way around the bottom of the shaft. As another way is thereby provided, persons are prohibited from crossing the shaft at the bottom. The particular danger thereby to be obviated is that from a descending cage. Its descent cannot well be known until near, and therefore the only safety is in not exposing the person beneath it. This is, as we think, the reason for prohibiting anyone from crossing the shaft bottom, instead of going around. We experience greater difficulty in construing the exception. Are those actually employed in working or repairing at or in the shaft bottom excepted, or are the words "at the bottom of the shaft" employed in the larger sense, so as to mean "about, near to, or in connection with" that portion of the shaft resting on the floor of the mine?

4. STATUTES: construction: exceptions to prohibitions.

Unless work is to be done or repairs made, there would seem to be no reason for making the exception; for crossing the shaft bottom would be quite as dangerous for those engaged in work about the bottom, such as a cager, as for miners generally. Familiarity with the situation would not shield from danger, where no one can see the

cage until practically upon the person attempting to cross, though some protection through signals might be possible. On the other hand, no necessity, reasonable or otherwise, appears for such a distinction.

There can be no occasion for others than those necessary to perform work at the bottom, or engaged in making repairs, to cross the shaft bottom; and this appears from the particularity in which a traveling way around the shaft is exacted. The bottom intended is that lowest down—beneath the cage. The plaintiff, in what he was assigned to do, was neither engaged in making repairs nor in performing work at the bottom of the shaft, and therefore was not within the class excepted from the operation of the statute. His duty to obey the law was not obviated by a custom the observance of which might have enabled him to do what he undertook in safety. Nor was he excusable in crossing, in violation of the statute because of the inconvenience of going around the shaft, or what might happen were the rope not pulled in time to avoid the piling of cars. His duty was to obey the law, as expressed in this statute; and in not so doing, he was guilty of such contributory negligence as to defeat recovery. The court rightly directed a verdict for defendant to be returned.—*Affirmed.*

PRESTON, C. J., EVANS, GAYNOR, and SALINGER, JJ., concur.